[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Attorney James Kelly A/AG Attorney Gregory Benoit, repr. child Attorney Stephen Kulig, repr. mother Attorney Dale King, repr. father
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS
This case concerns Elizabeth I. who is the subject of a petition filed by the Commissioner of the Department of Children and Youth Services (DCYS) to terminate the parental rights of Karen B., her mother and Augustine B. her father.
On April 10, 1989 a petition was filed by DCYS alleging Elizabeth to be a neglected/uncared for child. The Court issued an ex parte order of temporary custody on the same dated, and on April 18, 1989 a ten day hearing was held on that ex parte order. Both respondents appeared at the hearing, were represented by counsel and, after waiving the 14 day notice requirement entered admissions that the child was uncared for in that she was homeless. The Court adjudicated the child uncared for and committed her into the custody of the commissioner for the Department of children and Youth Services for a period not to exceed 18 months.
On November 6, 1989 DCYS filed a petition to terminate the parental rights of both respondents pursuant to Section 17-43a of the General Statutes. The petition was last amended on July 20, 1990. CT Page 2464
A trial was held on the termination petition on August 27, 1990. Only the respondent father appeared at trial, although both respondents were represented by counsel.
FACTS
Evidence offered at trial, interpreted in light of prior proceedings contained in the record of this case, of which the Court takes judicial notice, permits the finding of the following facts:
Augustine B. is a Canadian Indian who was born and raised in Canada. He was married five times before he married Karen I. on December 30, 1988. (Petitioners exhibits #1 and #2). Elizabeth was born on February 27, 1989, eight weeks premature, and weighing only 3 lbs. 7 oz. She was also born with a congenital heart defect. As a result of her premature birth and low birth weight Elizabeth required hospitalization for the first 6 weeks of her life. Mother was discharged from the hospital on March 1st.
Both mother and father moved to Florence, Kentucky on or about March 27, 1989 while Elizabeth was still in the hospital. On April 12, 1989 Elizabeth was discharged from the hospital and placed in foster care where she remains today. She has been in foster care all of her life.
The parents returned to Connecticut from April 12 to April 22, 1989 and attended the April 18th court proceeding at which time Elizabeth was adjudicated uncared for and committed to DCYS. On that same date both respondents entered into a service agreement with DCYS in which they agreed: to submit to a psychological evaluation; to keep DCYS informed of their whereabouts and address, to visit with Elizabeth and coordinate such visits with DCYS and the foster parents; to submit to an out of state placement investigation. (Defendant's exhibit A). Thereafter both parents again left Connecticut and moved to Ohio where father continues to reside.
Mother and father did submit to a psychological evaluation by Dr. Robert Meier, a licensed clinical psychologist, on May 17 and 18, 1989. However, they have not fully complied with the other parts of the service agreement.
Father moved several times but did not keep DCYS informed of his address and circumstances. He testified that he moved to Ohio and changed address three times after leaving Kentucky. Mother also moved to Ohio before returning to Connecticut after separating from Augustine. She then moved to New York and currently resides in the state of Washington. DCYS had planned on initiating an interstate placement home study in Kentucky; however, when the parents separated and moved from Kentucky the home study was held up as the parents had no permanent address for some time. Thereafter, father never requested that there be a home study conducted in Ohio. As a result, DCYS was unable to complete the interstate placement investigation agreed to in the service agreement of April 18, 1989.
The respondents separated from one another in May, 1989. Augustine CT Page 2465 married Alicia W. on September 1, 1989 without obtaining a divorce from Karen. (Petitioner's exhibit 5). Augustine and Alicia separated within two months of that marriage. Father is currently residing with a Joyce Smith. They appear to have plans of marriage.
DCYS had no contact with or communication from Augustine from May, 1989 until March, 1990. DCYS social worker Gary Hilliard, whose testimony the court finds credible, notified father's attorney in Ohio on October 2, 1989 that Elizabeth was having problems with her heart and would require surgery. He also called father's home on October 5, 1989 and notified Alicia that Elizabeth had undergone surgery on October 3rd to correct her heart defect. Mr. Hilliard testified that he called father's home on two occasions and left messages with his wife for Augustine to call DCYS but received no communication at all from father between May, 1989 and March, 1990. Father testified that contrary to Mr. Hilliard's testimony, he and others called and spoke with Mr. Hilliard several times between November, 1989 and January, 1990. However, there are no records of such calls ever being received by DCYS and Augustine has produced no record of such calls having been made, although he claimed that such records are in his possession. Consequently, the Court does not find father's testimony concerning these telephone calls to be credible.
Mr. Hilliard testified that Elizabeth has recovered from her open heart surgery and although requiring some therapy she appears to be a healthy and a very adoptable child.
On March 6, 1990 father appeared in this court to respond to the termination of parental right petition. Mr. Hilliard met with father in court and set up a visit with Elizabeth for March 19, 1990. That was the first direct contact that DCYS had with father since since May, 1989. A visit with Elizabeth was arranged for father for March 19, 1990. That visit marked the first time father had seen Elizabeth since May, 1989. Father's next visit with Elizabeth occurred on April 2, 1990, and the last recorded time that he saw her prior to the trial was during a court ordered parent-child evaluation with Dr. Mantell on July 30, 1990. Father testified that the reason he did not visit with Elizabeth was because he was working six and seven days per week and did not want to take the time off from his job.
Karen B., Elizabeth's mother moved to Ohio for a short time after her separation from Augustine in May 1989. She returned to Connecticut in late June or early July, 1990 and visited with Elizabeth several times during the summer of 1990 before moving to the state of Washington in September, 1990. Although mother has maintained monthly contact with DCYS she has seen Elizabeth only once since that time. Mother continues to live in the State of Washington, has recently given birth to another child, and is planning on getting married. Mother is not interested in having Elizabeth returned to her.
Sharon Kesten, Family Relations Officer assigned to the courts within CT Page 2466 the New London Judicial District, testified that Augustine was arrested on November 14, 1988 on a charge of Assault in the 3rd Degree, and on January 11, 1989 on a charge of Breach of Peace. Karen is alleged to have been the victim in both incidents. As of the day of trial both cases were unresolved as re-arrest warrants had been issued against Augustine in both cases. Ms. Kesten also testified that father was referred to the family violence intervention program but he did not successfully complete that program. The court accepts this testimony as credible and factually accurate.
CLINICAL EVALUATIONS
Dr. Robert Meier, a licensed clinical psychologist, conducted court ordered evaluations of both mother and father on May 17 and 18, 1989. At the time of the evaluation both individuals were living in Ohio. (Petitioner's exhibit #4).
Karen reported a serious history of emotional and psychological problems to Dr. Meier. She also reported incidents of physical abuse at the hands of her husband, Augustine. Dr. Meier concluded:
 It is clear that this young woman is in need of long term and intensive psychiatric care . . . . She has not followed through on treatment in the past and shows a very inconsistent and unstable pattern. It is highly questionable given her current status whether she would be able to safely care for a young child.
 Based on the results of this evaluation, both parents seem to be exhibiting behavior in addition their relationship is fraught with violence and has been extremely unstable. Given the current situation there is little indication that this will improve.
Father denied any physical abuse of Karen. He stated that he had not been arrested since he stopped drinking and that there were no difficulties in his marriage with Karen.
Subsequent to the interview, Dr. Meier received a call from mother who reported that she was in a shelter in Ohio having been physically abused by Augustine. The shelter personnel validated mother's presence in their facility to Mr. Meier.
A second court ordered parent-child psychological evaluation was scheduled for mother and Elizabeth with Dr. David Mantell, a licensed clinical psychologist, on January 9, 1990. Mother was notified but did not appear. (Petitioner's exhibit #8). Dr. Mantell did conduct a court ordered psychological evaluation of father and child on July 30, 1990.
Dr. Mantell reported and testified that there was no parent-child relationship between father and Elizabeth. "No recognition exists between father and child. . . ." He found that Elizabeth had clearly bonded with her foster mother, who she views as her psychological parent, and cried when CT Page 2467 left with father after the foster mother left the room at Dr. Mantell request. She calmed when the foster mother returned.
Father failed to report his marriage to Alicia to Dr. Mantell when giving his history even though that was his most recent marriage. He stated that he has been residing with Joyce Smith since February, 1990. Ms. Smith, who accompanied father to the evaluation, stated that she would like to help Augustine raise Elizabeth.
Father stated to Dr. Mantell that he had visited Connecticut six times since moving to Ohio. He said that he visited with Elizabeth once and that he last saw her two months earlier. He apparently forgot his visit with Elizabeth in March, 1990. Father denied any violence between Karen and himself in his interview with Dr. Mantell.
Dr. Mantell found that father's ". . . life has been in flux with few, extended periods of stability. How much stability may have prevailed at any particular time is a matter that would require careful, further research." He indicated that due to Augustine's complex and difficult past parenting history it would take an extensive study, including a long term observation of Augustine and Joyce, before he could determine whether and if Elizabeth could be allowed to live with her father. "His life history suggests that he is likely to have serious characterological difficulties that impede his capacity to make a successful family adjustment." Dr. Mantell testified that to place Elizabeth with her father at this time would be traumatic and not in the child's best interest. (Petitioner's Exhibit #7).
ADJUDICATION — ON FACTS AS OF JULY 20, 1990
The petition, as amended, cites the following grounds for termination: (1) abandonment; (2) failure to rehabilitate; (3) denial of care, guidance or control necessary for the well being of the children by acts of commission or omission; (4) no ongoing parent/child relationship.
ACTS OF OMISSION OR COMMISSION:
The court finds that the state has not proven this ground by clear and convincing evidence as to either parent. No evidence was presented that the child was denied any necessary care, guidance or control as the result of acts of commission or omission by the mother or father. The child was never in the care or custody of either parent. Certainly the care Elizabeth received from her foster parents for the one and one half years immediately preceding the trial was adequate. While Elizabeth may well have been denied the love, affection and emotional security of her natural parents that alone is not proof that she was deprived of any necessary care. (Emphasis added). Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267 (1984).
FAILURE TO REHABILITATE: CT Page 2468
Section 17-43a(b)(2) of the General Statutes provided for the termination of parental rights in the situation there a parent of a child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within reasonable time said parent could assume a responsible position in the life of the child, considering the age and the needs of said child. The court finds clear and convincing evidence that both Augustine B. and Karen B. have not achieved such degree of personal rehabilitation.
The lack of permanency and stability in fathers marital and personal relationships over the years including and preceding his marriage to Karen has continued subsequent to Elizabeth's commitment and is unlikely to change in the foreseeable future.
The marriage to Karen lasted less than five months, from December, 1988 until they separated in May 1989. Four months later father married Alicia without going through the legality of obtaining a divorce from Karen. Father testified that his marriage to Alicia was not legal because the person performing the ceremony was not properly licensed. Even if that is true, and there is no evidence to substantiate his claim, the fact of the matter is that a marriage license and certificate is on file in Boone County, Kentucky for this marriage. (Petitioner's Exhibit #5). The court finds it likely that father would have gone through the charade of a marriage ceremony had he been aware that the person performing the ceremony was not properly licensed. Thus, he was knowingly engaging in bigamy. If, however, the person performing the ceremony was unlicensed and Augustine was aware of that fact, then his deception of Alicia would be even more despicable than the act of marring her without first divorcing Karen. Augustine's marriage to Alicia lasted approximately two months. He is now apparently living with and planning to marry Joyce Smith.
Instances of marital violence, which existed prior to The birth of the child have continued subsequent to Elizabeth's commitment. Augustine's lack of candor with Dr. Meier concerning prior instances of physical violence toward his wife, have not been addressed by father. In addition, father has not resolved the two outstanding cases of family violence still pending in the court. Father's situation continues to be unstable. He is no closer to being able to provide a secure and stable home for Elizabeth now than he was when the child was committed as being uncared for/homeless.
Mother has demonstrated no interest in providing a home for Elizabeth. She has not altered her circumstances so as to be able to care for her daughter. Indeed, she has begun a completely new life with a new child and pending new marriage the width of continent away from Elizabeth.
The Court finds that neither parent will be able to assume a responsible position in the life of Elizabeth, considering her age and needs, within reasonable period of time.
This child has been in foster care all of her life. She is now one and CT Page 2469 one half years old and has never known either her father or mother. Neither parent has made any effort to reunite with their daughter, and given their pattern and history it is unlikely that either parent is likely to rehabilitate in the near or foreseeable future. Elizabeth needs and is entitled to a stable, secure, caring and nurturing home. It would be unreasonable and unfair to Elizabeth to require her to wait any longer for the establishment of permanent in her life.
Consequently, the Court finds that the petitioner has sustained it burden as to the ground of failure to rehabilitate by clear and convincing evidence as to both mother and father, and that this ground has existed for more than one year.
ABANDONMENT:
The Connecticut General Statutes sections 17-43a(b)(1) defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, 36 (1987).
Father visited Elizabeth exactly twice during the 15 months between April 18, 1989, the date of her commitment to DCYS, and July 20, 1990, the date the petition was last amended. He did not maintain contact or communication with DCYS from May, 1989, until March, 1990. His lack of concern and interest in his daughter was such that he did not even inquire about her health following her open heart surgery in October, 1989. There has been no personal interaction between father and child as father has failed to maintain contact with the child. He clearly has abandoned this child within the statutory definition of that term.
Although mother has maintained contact with DCYS, she has seen Elizabeth only once since her commitment to DCYS on April 18, 1989. There has been no personal interaction between mother and child since the child's birth. Mother has moved to the state of Washington where she has established a new life with a new family. Elizabeth is not a part of that new life. Mother too has failed to maintain a reasonable degree of interest, concern or responsibility in the welfare of this child.
"General Statutes (Sect.) 17-43a(b)(1) does not contemplate a sporadic showing of `interest, concern or responsibility for the welfare of a child.' A parent must maintain a reasonable degree of interest in the welfare of his or her child." In re Rayna M. Supra at 33-38. Maintain implies a continuing, reasonable degree of concern." In re Migdalia M., 6 Conn. App. 194, 210
(1986). The Court finds that the petitioner has proven by clear and convincing evidence that both parents have abandoned Elizabeth, as that term is defined by statute, and that this situation has existed for more CT Page 2470 than one year. In addition, the Court finds this ground proven as to father beyond a reasonable doubt.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defined this ground as the absence of an:
 ". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child."
The Court finds from the evidence clear and convincing proof that there is no parent-child relationship in existence between either parent and Elizabeth and that this situation has existed for all of the child's 13 months of life.
Neither of these parents has ever been involved in Elizabeth's life to the extent that he or she has contributed to the development of the child's physical, educational or moral upbringing. Neither parent has ever been the caregiver of the child as both effectively abandoned her at birth. Neither parent has visited with the child nor been concerned about her during and subsequent to her open heart surgery. Father has not communicated with or kept in contact with those who have had the child in their care and custody during the past year. Clearly that is not the way in which parents who love and care for their child behave.
The fact that there has been some contact between parent and child subsequent to the commitment in April, 1989 ". . .does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year. In re Juvenile Appeal, (Anonymous), 181 Conn. 638, 646 (1980).
Even though no parent-child relationship exists, that alone is not grounds to terminate a parents rights. The Court must also find by clear and continuing proof that to permit further time to establish such relationship could be detrimental to the best interest of the child.
For the reasons indicated in the portion of the Court's opinion concerning failure to rehabilitate, supra, the court also finds that the petitioner has proven that it would be detrimental to the child's best interest to allow any further time for such a parent-child relationship to develop.
The Court finds that the petitioner has proven by clear and convincing evidence that there exists no ongoing parent-child relationship between either parent and Elizabeth, and that to allow further time for such CT Page 2471 relationship to develop is not in the child's best interest.
DISPOSITION — AS OF AUGUST 27, 1990
Father has seen Elizabeth on only one occasion between the date the termination petition was last amended on July 20, 1990 and the date of trial on August 27, 1990. That "visit" took place in Dr. Mantell's office during a court ordered evaluation. There have been no changes in circumstances for either parent. Mother has had no contact with the child.
The Court finds, based upon all of the evidence presented, that the child's best interests would be served by terminating the parental rights of both Augustine and Karen B.
Before entering an order of termination however, the Court must consider the six factors set forth in subsection (d) of Section 17-43a of the Connecticut General Statutes.
(1) DCYS offered services to the parents in an effort to reunite them with their daughter. An out of state placement was planned but the parents separated and thereafter father did not keep the agency advised of his address or circumstances.
(2) The only court orders were for psychological evaluations and scheduled court appearances. Father appeared at his court ordered evaluations. Mother appeared for her first court ordered evaluation but did not keep her appointment for the second such evaluation. Father has appeared for court hearings. Mother did not attend the termination of parental rights trial.
(3) Elizabeth has no feelings or ties with her father or mother as she has not seen them often enough for such emotions to develop. Dr. Mantell found no interaction between father and child during his evaluation of July 30, 1990. The child is currently bonded with her foster mother with whom she has lived virtually all of her life.
(4) Elizabeth is one and one half years old with a date of birth of February 27, 1989. She has been in foster care all of her life and needs permanency now, and in the future.
(5) Neither parent has made any effort to adjust his or her circumstances or conditions to make it in the best interest of the child to return to his or her home in the foreseeable future. Dr. Mantell indicated that it could take years of study of father and his complicated history and lifestyle before an assessment could be made concerning his ability to provide a secure home for Elizabeth. Mother emotional problems have not been addressed as she has established herself in the state of Washington with a new family. There is no interest on that she is interested in Elizabeth. CT Page 2472
Neither parent has maintained regular contact with Elizabeth, and father has not maintained regular communication with DCYS or the foster mother. While father has been residing in Cincinnati Ohio, the distance is not so great that he was unable to visit with his daughter or communicate with her caregivers.
(6) Neither parent has been presented from maintaining a relationship with Elizabeth. The only extent to which father's economic circumstances were a factor in this case involved his decision to place his employment above his relationship with Elizabeth.
JUDGEMENT
Having considered the foregoing, it is found by clear and convincing evidence to be in the best interests of Elizabeth I. that the parental rights of her mother and her father be terminated so that she may be raised in permanent, secure and nurturing environment as an adopted child.
It is therefore ORDERED that the parental rights of Augustine B. and Karen B. in and to Elizabeth I. are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
Dated at Montville this 9th day of October, 1990.
TERENCE A. SULLIVAN, JUDGE.